**MADISON COUNTY JAIL INMATES, et al., Plaintiffs-Appellants,**

v.

**Mark THOMPSON, et al. Defendants-Appellees.**

No. 84–1677.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1985.

Decided Sept. 18, 1985.

As Amended Oct. 7, 1985.

Rehearing and Rehearing En Banc Denied Nov. 19, 1985.

Michael K. Sutherlin, Indianapolis, Ind., for plaintiffs-appellants.

Stephen M. Terrell, Ice, Miller, Donadio & Rayn, Indianapolis, Ind., for defendants-appellees.

Before COFFEY and FLAUM, Circuit Judges, and JAMESON, Senior District Judge.[*]

JAMESON, District Judge.

This is an appeal by Madison County Jail Inmates from a judgment notwithstanding the verdict in a class action pursuant to 42 U.S.C. § 1983. The jury awarded damages at the rate of $13.00 per day to all members of a subclass consisting of inmates incarcerated between October 19, 1979 and December 18, 1980, and $10.00 per day to the members of a subclass consisting of inmates incarcerated between December 19, 1980 and June 30, 1981. In its judgment notwithstanding the verdict, the district court awarded nominal damages of $1.00 and costs to the members of the first subclass and denied recovery to members of the second subclass. The primary issue on appeal is whether the evidence supports the jury verdict. We affirm in part and reverse and remand in part.

## I. Factual Background and Proceedings in District Court

This case is a consolidation of two class actions commenced in November, 1979, with the members of the Madison County Board of Commissioners and the Sheriff of Madison County named as defendants in their individual and official capacities. The suits were brought under section 1983, 42 U.S.C. § 1983, claiming violations of the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and seeking a declaratory judgment, injunctive relief, and damages. The class was defined as all present and future inmates of the Madison County Jail. Eleven individual causes were either dismissed or consolidated because the claims were identical to those in this case. After consolidation, the class continued to request additional damages for four individual inmates.

On February 15, 1980 the court entered a Consent Decree and Partial Judgment. The decree described the existing conditions at the Madison County Jail. Summarized briefly the facility, erected in 1938, (1) lacked ventilation; (2) had no capacity for controlling the heating and cooling system with resulting temperatures which varied from over 100 to freezing; (3) was unclean and generally unsanitary; (4) was a haven for cockroaches; (5) often had inoperative showers, toilets and wash basin facilities; and (6) had inadequate lighting. In addition there was no general library available to the inmates and the facility had no recreation or exercise program. The jail also had no written policy with regard to (1) inmate classification based upon reasonable criteria; (2) an inmate's right to communicate with relatives, friends, or his attorney; and (3) the administration of the jail and the discipline of inmates. Because the facility was overcrowded about 50% of the time and due to the physical design of the jail the sheriff was not able to segregate those detained for violent crimes from those charged with nonviolent crimes. Also, because of limited staff and nonfunctioning TV monitors, the inmates were not adequately supervised.

The February, 1980 Consent Decree provided injunctive relief, ordering the construction of a new facility and interim improvements of the existing facility. On May 9, 1980, reacting to the death of two inmates in the jail, the inmate class filed a petition requesting the court to determine whether the defendants were in compliance with the terms of the Consent Decree. The court approved a Memorandum Report describing the problems and intended resolution on August 5, 1980. All the parties agreed that frequent, i.e., less than hourly, monitoring of the residential inmate areas and the special holding areas was not yet achieved. It was agreed that increased emphasis on training and educating the staff and operative TV monitoring cameras by September 1 would improve the existing situation.

The county commissioners had intended to fund the new jail by the issuance of a general bond obligation. This plan was frustrated by a successful remonstrance.

[*] The Honorable William J. Jameson of the District of Montana, sitting by designation.

Since it was an election year the defendants took no further action until after November. The newly elected commissioners decided to disregard the plans of the prior commissioners. A new construction site was selected and new jail plans were drawn up. The court set June 26, 1981 for a hearing on compliance with the Consent Decree. The court found that although the defendants were not strictly complying with the decree they were acting in good faith.

On November 22, 1982, it was agreed at a pretrial conference that the class would be closed as of June 30, 1981. On August 4, 1983 the court approved a Pretrial Entry in which the defendants "admitt[ed] liability as to general damages on all matters and conditions enumerated in the Consent Decree of February 15, 1980."

The trial began November 1, 1983. The defendants admitted that prior to December 19, 1980 the Madison County jail did not meet minimal constitutional standards. They contended, however, that the improvements made in the jail pursuant to the February 15 Consent Decree resulted in the jail meeting constitutional standards on and after December 19, 1980. The jury found, however, that the jail did not meet constitutional standards between December 19, 1980 and June 30, 1981. The jury returned a verdict awarding $13.00 per day for the first subclass period, those incarcerated between October 19, 1979 and December 19, 1980, and $10.00 per day for the second subclass, those incarcerated between December 19, 1980 and June 30, 1981. The damages awarded, involving approximately 3700 inmates, totaled in excess of a half million dollars. The jury awarded special damages of $10,000 to Ricky G. Baines, who had been assaulted in the jail. In two other claims of inmates seeking special damages the court directed a verdict for the defendants, and in a third case the jury returned a verdict for the defendants.

The defendants moved the court to enter judgment notwithstanding the verdict. After rescheduling the hearing on the motion so that the parties might conduct settlement negotiations, when a final settlement was not forthcoming the court granted defendants' motion. In granting the motion the court was influenced by the analysis of Judge MacKinnon in *Doe v. District of Columbia*, 697 F.2d 1115 (D.C.Cir.1983) (MacKinnon, J., Separate Statement reported at 701 F.2d 948). The court stated that, in line with Judge MacKinnon's analysis, it was motivated to grant defendant's motion by several factors. The court noted the pendency of additional class actions by jail inmates seeking similar injunctive relief and money damages and the fact that the judgment or any settlement would affect not only the interest of the class members but the public interest as well. Relying on *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Ryland v. Shapiro*, 708 F.2d 967, 976 (5th Cir.1983); and *Doe v. District of Columbia*, 697 F.2d 1115 (D.C.Cir.1983) (Separate Statement reported at 701 F.2d 948), the court held that "[p]laintiffs may not recover damages for violation of constitutional rights in the absence of proof of actual harm." The court concluded that "the evidence of actual harm was insufficient to support the verdicts."

The court awarded $1.00 nominal damages and costs to the members of the first subclass, entered judgment for the defendants on claims of the second subclass, and denied the motion for judgment notwithstanding the verdict on the claim of Rickey G. Baines.

## II. Contentions on Appeal

Appellants contend that the district court erred in (1) granting the motion for judgment notwithstanding the verdict and disregarding evidence "which established the totality of circumstances which caused cruel and unusual punishment," resulting in compensable damages; (2) "imposing its own value judgments and assessment of society's needs;" (3) breaking its fiduciary responsibility by interfering with and rejecting a preliminary settlement negotiated by the parties; and (4) allowing the consolidation of numerous individual complaints,

but failing to accept a representative presentation of evidence.

Appellees contend that (1) the court properly granted the judgment n.o.v. because the verdict was not supported by substantial evidence; and (2) the court did not abuse its discretion with regard to any proposed settlement because no settlement agreement was reached. Appellees also raise three claims of evidentiary error which are relevant only if the judgment n.o.v. is reversed. They claim that the court erred in admitting in evidence (1) grand jury reports; (2) the testimony of Dr. Dwight Schuster; and (3) evidence regarding the assault of Glen Adkins.

### III. Standard of Review

In reviewing a judgment n.o.v. the considerations are the same as those applicable in the review of a directed verdict. The court of appeals must determine whether the evidence warranted submission of the case to the jury. *Appleman v. United States*, 338 F.2d 729, 730 (7th Cir. 1964), *cert. denied*, 380 U.S. 956, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965). A judgment n.o.v. may be granted only if there is not evidence upon which a jury could properly return a verdict for the non-moving party. *Schultz v. Owens-Illinois Inc.*, 696 F.2d 505, 510–11 (7th Cir.1982). The evidence, with all inferences which can be reasonably drawn therefrom, must be viewed in the light most favorable to the party opposing the motion. *Id.* at 511. *See also Kolb v. Chrysler Corp.*, 661 F.2d 1137, 1140 (7th Cir.1981).

### IV. Evidence to Support Jury Verdict

In determining whether the district court erred in granting the motion for judgment n.o.v. two questions are presented: (1) whether there was sufficient evidence to support the jury's finding that the jail did not meet minimal constitutional standards during the second subclass period, i.e., from December 19, 1980 to June 30, 1981; and (2) whether there is sufficient evidence

to support the jury's award of actual damages with respect to both subclass periods.

### A. Jail Conditions During Second Subclass Period

With respect to jail conditions during the second subclass period, the jury was instructed:

> If you find that on and after December 19, 1980, conditions in the Madison County Jail were such that:
>
> (a) inmates could not be assured a reasonably safe environment including acts of violence and sexual assault and threats of acts of violence and sexual assault; or
>
> (b) inmates were not provided food prepared under safe conditions; or
>
> (c) inmates were not provided shelter which did not threaten physical and/or mental degeneration including protection from excessive temperatures and unsanitary conditions; or
>
> (d) inmates were not afforded adequate medical care; or
>
> (e) in general, the conditions then existing were incompatible with contemporary standards of decency that are the mark of a maturing society,
>
> then you may find that conditions in the Madison County Jail on and after December 19, 1980, did not meet minimal constitutional standards.

Robert Jones, the director of Madison County Health Department, testified concerning the inspection of the jail's food preparation and storage facility. He stated that on November 12, 1980 the facility received an overall score of 43. He also indicated that the 1980 scores as compared to the 1979 scores were slightly lower.[1] TR. at VII, 46–53. Although this inspection was about one month prior to the beginning of the second subclass period, the jury could have inferred that similar conditions continued into the second sub-

---

1. The inspection on October 15, 1981 revealed much improvement. The facility received a score of 77. TR. VII, 53, 59. This inspection, however, was three and one-half months after the end of the second subclass period.

class period and that the food was not prepared under safe conditions.

Darance White had been incarcerated during both subclass periods. He testified that the conditions in March, 1981 were the same as those in September, 1979. TR. at IV, 167. John English had been an inmate during the second subclass period. He testified that the jail was "hot, by steaming heat. It was hard to breathe in that heat." TR. at VII, 70. The jury could have concluded that the inmates were not protected from excessive temperatures or unsanitary conditions.

While in jail, English observed the brutal homosexual assault on Glen Adkins.[2] Adkins was beaten on two separate days. The prison officials knew nothing of these attacks until informed by English upon his release to go to court. TR. at VII, 86–95. English testified that the prison officials never physically looked at each individual in the cell block, TR. at VII, 92, and that the guards made infrequent weekend checks on the cell block, TR. at VII, 85. English also described the oppressive effect on inmates when confined with an inmate who is a bully. Tr. at VII, 94. From this testimony the jury could have concluded that the inmates were not assured a reasonably safe environment.

We conclude that there is ample evidence to support the jury's finding that the jail did not meet constitutional standards during the second subclass period and that the district court erred in entering judgment in favor of the defendants notwithstanding the verdict.

**B. Proof of Injury and Actual Damages**

■ The jury was instructed to determine whether the damage or injury complained of by the inmates was proximately caused by the defendants' unconstitutional acts and omissions. The injury claimed by

the class was denial of rights guaranteed by the Constitution, including due process and equal protection. The totality of the circumstances, the inmates contended, resulted in the inmates being submitted to cruel and unusual punishment. The inmates argue that the cruel and unusual punishment present at Madison County Jail, in that it was "inflicted upon each and every inmate[,] must presumptively have harmed everyone." The only specific harm identified by the inmates that is applicable to all the members of the class was increased stress. The testimony of Dr. Dwight Schuster and five former inmates was offered in support of this contention. Three of the four who claimed additional individual damages, Bernard Bond, Roger Corbin and Rickey Baines, were among those who testified.[3]

Baines, who received a jury verdict of $10,000, had been assaulted in his cell. He testified regarding the conditions in the various cell blocks in which he was confined, and that during his stay in Block D he had observed homosexual activity, food stealing and fights. He indicated that these incidents were not reported because of fear of retaliation. TR. at III, 87. Baines also observed toilet paper hoarding. TR. at IV, 146. While confined in the "boards"[4] Baines stated that he was very depressed. TR. at III, 102.

Corbin had been involved in a fight while in the jail, but his claim for additional damages was rejected by the jury. He testified that he would not shower because he feared homosexual assault. TR. at IV, 29–30. He also testified that food was stolen from the inmates by threat of violence. TR. at IV, 28–29. Corbin testified that as a result of his incarceration he was "pale, anxietous [sic] and tormented" and that he had lost about 25 pounds. TR. at IV, 45. However, he later admitted that he had

2. Glen Adkins sought damages in a separate suit and does not claim additional damages in this class action.

3. Richard B. Titley, the other inmate who claimed individual damages, had committed su-

icide while in the Madison County Jail. The administratrix of his estate was a party plaintiff.

4. This cell block was so named because a board was provided for the inmates rather than a mattress.

suffered emotional distress prior to his stay in the jail. He in fact had been seeing a psychiatrist regularly after having suffered a nervous breakdown. TR. at IV, 61–62.

Bond, who had been incarcerated 121 separate times, 22 during the period at issue, testified that he had never been involved in a fight at the jail and that he had heard of but never witnessed homosexual activity. TR. at IV, 192. He, too, indicated that food and cigarettes were stolen. TR. at IV, 187. Bond's claim for separate relief was rejected by the jury.

Former inmates John English and Darance White made no claim for damages beyond those of the class. English testified, as discussed *supra*, that he had been in the same cell with Glen Adkins when Adkins was violently beaten and homosexually raped. He testified that he was fearful and scared during his eight day stay at Madison County Jail. TR. at VII, 96. White testified that he was beaten for no apparent reason while playing checkers. TR. at IV, 153.

Dr. Dwight Schuster, a physician specializing in forensic psychiatry, had never visited Madison County Jail, so his testimony was confined to general statements about human reactions to conditions like those present at Madison County Jail. He testified that the environment of the jail would cause stress to anyone. TR. at VI, 150. He elaborated, saying that stress reactions vary with the preexisting condition in the individual, the duration of the stress, and isolation versus group association. TR. at VI, 151. He estimated that about ten percent of the population would react with significant emotional or mental difficulty. TR. at VI, 153. He noted that "as a general rule, the longer the period of stress, whatever kind it is, it is more likely there will be a breakdown." TR. at VI, 158.

Dr. Schuster testified that "the experience of being in jail of itself is certainly something that leaves its mark, and when the jail conditions of incarceration have other negative elements the mark is probably more severe." TR. at VI, 154. He testified further that "every individual that goes through a jail experience is going to have that mark that he or she will remember the rest of their life." *Id.* Dr. Schuster stated that fear of homosexual attack is prevalent among younger inmates in all prisons. TR. at VI, 156. Upon being asked whether the opinions he had given would be true for any penal facility, Dr. Schuster answered, "Yes." TR. at VI, 162. He also testified that if a person is bent on suicide it is difficult to stop him. TR. at VI, 164. He indicated that those inmates who stayed only a short time in the Madison County Jail would be less affected than those who stayed, for example, thirty days. TR. at VI, 170. Dr. Schuster also stated that something as simple as a color could affect a person. TR. at VI, 174.

We conclude, after reviewing the record, that the plaintiffs failed to present evidence which would support a finding of consequential injury to the class as a whole. The testimony of the inmates, in the main, reaffirmed the nature of the conditions in the jail. Corbin indicated his fear of homosexual attack but Dr. Schuster stated that this fear is common among all young inmates. Also, Dr. Schuster indicated that only 10% of the inmates confined for long periods of time would have suffered severe stress. Mark Thompson, Sheriff of Madison County, testified that 80% of the inmate class were detained for a period of two days or less.[5] The inmate who had suffered personal injury which occurred as a consequence of inadequate supervision, Baines, recovered individual damages.

### C. Compensable Damages for Deprivation of Constitutional Rights

■ The Indiana Civil Liberties Union, in its amicus brief, argues that where substantive rights are violated damages can be

---

**5.** Another 17½% were in jail from three to 49 days; 1% from 50 to 99 days; and 1.5% in excess of 100 days. TR. at XII, 18.

presumed even in the absence of discernible consequential injuries. It cites *Lenard v. Argento,* 699 F.2d 874, 889 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) and *Owen v. Lash,* 682 F.2d 648, 658–59 (7th Cir.1982), in support of this contention. It is true that *Owen* and *Lenard* recognize that under certain circumstances it is proper to presume damages.[6] From our examination of the circumstances of this case and considering the nature of the constitutional violations involved, we conclude that this is not a case where damages may be presumed.

In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court reversed this court's holding that students were entitled to recover substantial non-punitive damages without a showing of consequential injury where they had been denied procedural due process.[7]

The Court concluded:

> In sum, then, although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983, we hold that neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused.

*Id.* at 264, 98 S.Ct. at 1052.

The Court recognized, however, that damages may be appropriate without a showing of consequential injury under some circumstances:

> [T]he rules governing compensation for injuries caused by deprivation of constitutional rights should be tailored to the interests protected by the particular right in question....

*Id.* at 259, 98 S.Ct. at 1050.

> [T]he elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another.

*Id.* at 264–65, 98 S.Ct. at 1053.

This court considered this holding in the cases cited by the Indiana Civil Liberties Union. In *Owen* we "declin[ed] to attempt to resolve the question," noting that remand was required on another point, i.e., to determine whether the defendant, in his individual capacity was immune from liability for damages. 682 F.2d at 659. In *Lenard,* applying *Carey,* we examined the circumstances of that case and the constitutional issues involved in order to determine the appropriate prerequisite for a damage award. 699 F.2d at 889.[8]

In the subsequent case of *Crawford v. Garnier,* 719 F.2d 1317, 1324 (7th Cir. 1983), we noted that while *Owen* and *Lenard* "suggest that certain constitutional violations may support an award for damages in the absence of consequential injuries, neither of those decisions spoke directly to the issue as did *Kincaid* [*Kincaid v. Rusk,* 670 F.2d 737, 745–46 (7th Cir.1982)] and neither discussed or cited Kincaid." In *Kincaid* the plaintiff sought damages against a sheriff for violation of his due process and First Amendment Rights in denying him reading material. This court held that the plaintiff had failed to prove compensable damages, but was entitled to

---

6. It should be noted that neither *Owen* nor *Lenard* was a class action. Both were individual section 1983 claims seeking damages for a deprivation of constitutional rights. Here per diem awards of damages were made to all members of two subclasses.

7. The Court noted that a number of lower courts had approved "the awards of nominal damages under § 1983 where deprivation of constitutional rights are not shown to have caused actual injury." 435 U.S. at 266–67, n. 24, 98 S.Ct. at 1054, n. 24.

8. Lenard was arrested for drunken driving and several other traffic offenses. He contended that he had been beaten by police officers and knocked unconscious. Examining the circumstances of that case and the "substantial constitutional issue," we concluded that a jury could properly consider and award damages for the violations "in the absence of discernible consequential injuries."

nominal damages. In *Crawford*, the plaintiff challenged his termination from a federal emergency employment program as violation of his First Amendment right of free speech. We upheld an award for lost wages, injury to reputation, and pain and suffering, but held that the plaintiff was not entitled to an additional award of $10,-000 "for injury to his civil rights" and that award should be reduced to $1.00.

We now examine the circumstances of this case and the nature of the constitutional violation to determine the appropriate prerequisites for a damage award. Neither *Carey v. Piphus* nor any of the prior cases in this court involved a class action. The court was concerned in each case with whether an individual plaintiff had sustained compensable damage. While the motion for judgment n.o.v. was pending, the case of *Doe v. District of Columbia, supra*, was brought to the court's attention. The district court found Judge MacKinnon's separate statement reported at 701 F.2d 948, persuasive in concluding that the evidence was insufficient to support the verdicts and that the plaintiffs could not recover damages for violation of their constitutioal rights in the absence of proof of actual harm.

In *Doe* the jury, as did the jury in the instant action, awarded damages to a class made up of inmates based on the claim of cruel and unusual punishment and the failure to provide adequate protection from assault. There, too, the total award amounted to over $500,000. *Doe*, 701 F.2d at 948–49. Injunctive relief was also granted. The case was remanded for a new trial based on procedural errors. Judge MacKinnon "acquiesce[d] in the court's decision only because defendants [did] not appeal[ ] from the district court's decision to deny

their motion for judgment n.o.v." *Id.* at 948. Judge Robb agreed with Judge MacKinnon.

Judge MacKinnon began his discussion by stating that he doubted whether there was sufficient evidence to support a conclusion of constitutional violation but addressed the damage award nonetheless. He noted that after "diligent research" he could find no case where money damages to a class of prisoners has been upheld. *Id.* at 949. His research revealed that in the past only individual prisoners have been awarded money damages. Indeed, the cases cited by the appellants to support their argument that per diem compensation is a well recognized methodology for compensating prisoners are all claims made by individual prisoners.[9] In sum, Judge MacKinnon was loathe to grant money damages to a *class* of prisoners in mass that includes many prisoners who are causing the conditions complained of and who will not cooperate to help correct them. *Doe*, 701 F.2d at 949.[10]

A review of the record reveals that the prisoners at Madison County Jail caused some of the conditions complained of. The homosexual attacks, food stealing, and fights were, of course, all committed by inmates. White testified that the inmates swept debris into the floor drains which resulted in their becoming clogged. TR. at IV, 169–71. Baines testified that the inmates would put blankets in the drains and toilets to "make the floor flood to get the guards up so they could get attention." TR. at IV, 145. He also testified that the inmates would hoard toilet paper and that some inmates would use the toilet paper to start fires to heat coffee. TR. at VI, 145–146. Corbin testified that he and other

9. The appellants at p. 29 of their brief cited *O'Conner v. Keller*, 510 F.Supp. 1359 (D.Md. 1981); *Mickens v. Winston*, 462 F.Supp. 910 (E.D.Va.1978), *aff'd*, 609 F.2d 508 (4th Cir.1979); *Mack v. Johnson*, 430 F.Supp. 1139 (E.D.Pa. 1977); *United States ex rel. Neal Rockerfeller*, 312 F.Supp. 863 (S.D.N.Y.1970), *aff'd in part, sub nom., Sostre v. McGinnis*, 442 F.2d 178 (2d Cir.1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

10. Recognizing that class actions are designed to eliminate the necessity of bringing "a multiplicity of identical cases," Judge MacKinnon noted that "class actions were not intended or designed to reduce the standard of proof that one single case required or to substitute a large smoke screen of facts for concise proof of the basic elements required to prove the case alleged." *Id.* at 951.

inmates did not report observed fights, TR. at IV, 28–29, homosexual assaults, TR. at IV, 30–31 or food stealing, TR. at IV, 53, to the prison officials. Baines also testified that this type of activity was not reported. TR. at III, 88.

Both appellants and the Indiana Civil Liberties Union rely on *Dellums v. Powell,* 566 F.2d 167 (D.C.1977), a class action by demonstrators on the steps of the United States Capitol who had been arrested at a Vietnam War protest rally. The jury had awarded $7,500 to each demonstrator for denial of First Amendment rights. The D.C. Court of appeals reversed and remanded for a redetermination of First Amendment damages, holding that the $7,500 judgment was "totally out of proportion to any harm that has been suffered." [11] *Id.* at 196.

The jury had also awarded $500 to each class member for cruel and unusual punishment, $3,000 to each of eight class members who actually stood trial for malicious prosecution, and $50 to all other class members for malicious prosecution.[12] The comments of Judge Leventhal in his concurring opinion with respect to the award for cruel and unusual punishment are pertinent to this case. Judge Leventhal said in part:

A second reason why the $500 per plaintiff award cannot stand is that individual plaintiffs were confined under greatly differing conditions. As is clear from the award of false imprisonment, some members of the class were detained for substantially less time than others. One-half of the class was not taken to the D.C. cell block, where conditions were apparently most inhumane. It appears that even among those imprisoned at the same location, there may have been significant differences in terms of food and bedding supplied, medical attention, use of physical force, etc. Under these circumstances, a uniform award was inappropriate.

*Id.* at 208–09 (Leventhal, J., concurring).

With respect to the award for infringement of First Amendment rights, Judge Leventhal said:

Also disturbing is the possibility that the jury might have included damages for mental distress and suffering. I recognize that an individual plaintiff suing for violation of first amendment rights is not limited to out-of-pocket expenses but may, upon a proper showing, recover for emotional harm. [citations omitted] But in the context of a large class action, there is simply too much room for variation on this item among members of the class. Thus, while individual class members might be permitted to recover for emotional harm upon a proper showing, the uniform class award for first amendment damages cannot in all fairness encompass this. The class award must focus on the injuries sustained by all members of the class—the value that each one of them would necessarily place on the rights of free expression and assembly in the circumstances of this case. The class award for fourth amendment damages included an element for humiliation of arrest and detention, which may be deemed inescapable for any false detention. Beyond this, however, the award to all members of the class as a class cannot go. In sum class-wide damages must be those which necessarily arise from events which made this action appropriate for class treatment in the first place....

*Id.* at 209–10 (Leventhal, J., concurring).

In support of their contentions that inmates may recover for mental anguish and distress, and pain and suffering appellants cite this court's opinion in *Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir. 1983). In *Mary Beth G.* four plaintiffs

---

**11.** Judge Tamm dissented. He would have reversed and held the police officers immune as a matter of law.

**12.** The jury had also awarded damages for false arrest and false imprisonment on a sliding

scale, depending upon the length of time in detention. While this award was upheld, the court questioned the awards for cruel and unusual punishment and malicious prosecution.

were among a group that brought a class action against the City of Chicago for its policy of strip searching all females, including those arrested for misdemeanor offenses, while awaiting arrival of bail money. The district court agreed with the plaintiff that the strip search policy violated the Fourth Amendment. Jury trials were then held on the issue of damages, resulting in verdicts of $25,000 each for two plaintiffs, $30,000 for one plaintiff, and $60,000 for the fourth plaintiff. In upholding the awards, the court said in part:

> The testimony offered by each woman regarding emotional and mental distress resulting from the searches was adequately corroborated by persons who knew the women best. The testimony revealed, *inter alia,* instances of shock, panic, depression, shame, rage, humiliation, and nightmares, with lasting effects on each woman's life.

723 F.2d at 1275. It is clear that the awards in *Mary Beth G.,* were based on proof of actual damages sustained by each individual plaintiff and not on classwide damages. In the instant case, the award to Rickey Baines is affirmed on the basis of proof of actual damages sustained by Baines. Other claims for individual damages were rejected.

The parties have cited, and we have found, only one case, *McElveen v. County of Prince William,* 725 F.2d 954 (4th Cir. 1984), upholding an award of compensatory damages to inmates in a class action claiming constitutional violations in jail or prison conditions. There the court affirmed a jury award of $210,000 in a class action on behalf of the inmates of a county jail conceded to be "a terrible facility" which "exceeded permissible constitutional limitations." Without referring to *Carey v. Piphus* or further discussion, the court concluded that, "Numerous actual and compensable injuries were presented by plaintiffs at trial." *Id.* at 958.

We share the concerns of Judge MacKinnon in *Doe v. District of Columbia* and Judge Leventhal in *Dellum v. Powell* with respect to the award of classwide damages to jail inmates for cruel and inhumane punishment. This is not a case where compensable damages may be awarded in the absence of proof of actual harm. We agree with the district court that the evidence was insufficient to establish actual harm for the 3,700 inmates for whom damages were awarded. While the evidence does not support a finding of consequential damages, nominal damages are appropriate.

## V. Settlement Negotiations

■ Pending action on defendants' motion for judgment n.o.v. the parties entered into settlement negotiations. On February 22, 1984, the plaintiffs sent a settlement proposal to the defendants, with a copy of the letter to the district court. At a hearing on March 1, 1984, the court informed the parties of its decision to grant the judgment n.o.v. The appellants contend that the district court breached its fiduciary duty imposed by Fed.R.Civ.P. 23(e).[13] They assert that this breach resulted from the court's "reject[ion of] the preliminary settlement which had been negotiated by the parties."

Appellees contend that no settlement agreement was ever reached. During the hearing on March 1, 1984, counsel for the appellants stated, "I think it is only fair to report to the Court on the record that the parties have been *attempting to negotiate* a settlement in good faith." (emphasis added). In its order of April 13, 1984, granting defendants' motion for judgment n.o.v. the court, in referring to the March 1 hearing, said in part: "Counsel represented that settlement negotiations had been conducted and were continuing. However, no final settlement had been reached, and it was the Court's understanding from counsel for defendants Madison County Council and Commissioners that no settlement could be reached without approval by the

---

**13.** Fed.R.Civ.P. 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Council and the Commissioners." In granting defendants' motion the court was motivated in part "by the fact that the judgment and any proposed settlement affected the public's interest as well as the interest of the class members."

■ The district court has considerable discretion in determining whether settlement is fair and reasonable. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir.), *cert. denied, sub nom. Abate v. Pittsburgh Plate Glass Co.*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *reh. denied*, 420 U.S. 913, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975). A district court order approving or disapproving a proposed class settlement will not be overruled on appeal unless there is a clear showing of abuse of discretion. *In re Traffic Executive Ass'n —E. R.R.*, 627 F.2d 631, 633 (2d Cir.1980) (petition for writ of mandamus to compel the district judge to approve the proposed settlement of a class action was denied). "In the exercise of his discretion the most significant factor for the district judge is the strength of plaintiff's case balanced against the settlement offer." *Id.* Even if the parties had agreed upon a settlement the court, having determined that the class as a whole had failed to prove damages, would not have abused its discretion in disapproving any settlement.

## VI. Conclusion

The judgment n.o.v. as to the first subclass, those inmates incarcerated during the period from October 17, 1979 to December 18, 1980, is affirmed. The judgment n.o.v. as to the second subclass, those inmates incarcerated during the period from December 19, 1980 to June 30, 1981, is reversed. The case is remanded to the district court to enter judgment in favor of the second subclass for nominal damages of $1.00 together with costs.[14]

**14.** Appellees contend that the court erred in admitting into evidence (1) grand jury reports, which included reports on jail conditions prior to October 19, 1979; (2) the testimony of Dr. Schuster; and (3) evidence regarding the assault on Glen Adkins. We conclude that the court did not abuse its discretion in the admission of

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.

COFFEY, Circuit Judge, concurring.

I concur in Judge Jameson's opinion. I write separately only because I believe it is imperative that we detail the alleged deficiencies in the jail's structure and operation that allegedly caused the claimed trauma or stress that gave rise to the award of monetary damages. The plaintiffs in this class action are divided into two sub-classes of inmates incarcerated in the Madison County Jail, the first group being those persons residing in the jail between October 19, 1979 and December 18, 1980 and the second group consisting of those persons residing in the jail between December 19, 1980 and June 30, 1981. At the trial, the defendants admitted that prior to December 19, 1980, the Madison County Jail did not meet minimum constitutional standards, stating in a signed consent decree of February 15, 1980, that:

"(1) the jail was over crowded approximately fifty percent of the time;

(2) there was no ventilation in any of the cell blocks;

(3) the shower and toilet facilities were often inoperative and that drainage and plumbing was inadequate, often causing back ups in the drains;

(4) the closed-circuit security televisions were inoperable;

(5) many windows were boarded up in an attempt to block out the elements, or were inoperable, thereby allowing the elements to come into the cell block areas;

(6) the physical design of the jail limited the opportunity to segregate inmates;

(7) that the administrative staff in the jail was inadequate to provide proper supervision;

any of this evidence. See Fed.R.Evid. 703, 705, 401. In any event, any error was harmless, particularly in view of the fact that recovery is limited to nominal damages. See FED.R.CIV.P. 61. It is not necessary, therefore, to discuss appellees' contentions.

(8) there was no recreation or exercise area available to the inmates;

(9) the program for providing healthcare to inmates was inadequate; and

(10) no written policy was enforced governing the administration of the jail."

The consent decree went on to state that the County would remedy these deficiencies in the jail.[1] The County, while admitting that the jail did not meet the minimum constitutional standards during the time persons in the first sub-class were incarcerated in the jail, claimed at trial that funds had been expended to improve the conditions in the jail and that after December 19, 1980 and through June 30, 1981 (the second sub-class period), the jail did in fact meet minimal constitutional standards. However, as detailed in Judge Jameson's opinion, the plaintiffs from the second sub-class period did present evidence that the food was inadequate,[2] that the ventilation had not substantially improved,[3] and also that proper jail supervision of inmates was still lacking.[4] As noted in Judge Jameson's majority opinion, judgment notwithstanding the verdict may be granted only where the evidence, read in the light most favorable to the party opposing the motion, is insufficient to support the verdict. *See, e.g., Schultz v. Owens-Illinois,* 696 F.2d 505, 510–11 (7th Cir.1982).

While the record contains numerous references to the various alleged undesirable conditions existing in the jail, the issue on appeal is whether there is any evidence in the record to support an award of damages on a class-wide basis. It is not the conditions in the jail that properly give rise to an award of damages; rather it is the alleged trauma or stress suffered by the inmates as a result of those conditions that give rise to an award:

"Specifically, it would appear that prisoners may recover for the infringement of three interests: (i) bodily integrity; (ii) peace of mind; and (iii) earning capacity. In otherwords, the plaintiffs are entitled to compensation for any physical injuries, pain and suffering, emotion distress and impairment of their prospects for future employment proximately caused by the defendant's unconstitutional conduct."

*Doe v. District of Columbia,* 697 F.2d 1115, 1124 (D.C.Cir.1983) *citing Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (interests of prisoners correspond "reasonably closely to the interests protected by analogous common-law tort rules.") The jury in this case was instructed that before it could award damages, the class had to establish that it suffered actual harm or injury. The class presented evidence that certain inmates had allegedly suffered injuries from sexual attacks while incarcerated in the jail. However, the only evidence presented of any class-wide injury was the testimony of one Dr. Schuster describing the alleged stressful conditions of inmates in confinement. Prior to testifying, Dr. Schuster, a forensic psychiatrist practicing in Indianapolis, Indiana, reviewed various grand jury reports describing the conditions in the jail during the first sub-class period. Based upon his review of these reports, he testified that the conditions in the jail would "cause stress to anyone." Tr. VI at 150. However, the record discloses that Dr. Schuster failed to interview any of the inmates much less even visit the very jail structure, its confines or inmates. It is difficult for me to understand how a mere examination of the grand jury report can

1. Since the time of this action, the County has completed construction of a new jail facility.

2. Robert Jones, the Director of Madison County Health Department, informed the court that the jail's food preparation and storage facility received a low score of 43 just prior to the commencement of the second sub-class time period, December 19, 1980 to June 30, 1981.

3. Inmate White testified that during his stay in the jail in March of 1981, it was hot and stuffy.

4. Inmate English, who observed a brutal homosexual assault on Glen Adkins, testified that while he was incarcerated during the second sub-class period, prison officials never examined the inmates in the cell block to determine if anyone had been injured and, on weekends, guards rarely checked the cell block.

give a forensic psychiatrist the necessary knowledge and data of a particular fact situation to deal in percentages and to make a well-reasoned, logical judgment to a degree of medical certainty that conditions in the jail would cause "stress to anyone," regardless of the inmate's period of confinement. Nevertheless, Dr. Schuster did couch his alleged findings to a degree when stating that the emotional reaction would vary, depending upon factors such as the individual's psychological makeup and the duration of the person's incarceration. Significantly, he admitted that only approximately ten percent of the inmate population would react with a "significant emotional or mental difficulty" to conditions in the jail. While he did state that younger inmates would fear homosexual attack, he went on to note that these fears were common among all young inmates in all prisons. As demonstrated by Dr. Shuster's testimony, an individual's reaction to a stressful situation will vary depending upon the length of incarceration, and his emotional stability before and during his confinement in the prison. In this case, the vast majority of the class, approximately 80 percent, were incarcerated for two days or less; given the very short stay (48 hours or less) of the vast majority of the members of the class in the jail, it is doubtful that their exposure to the conditions in the jail caused them any actual injury. Thus, I believe the evidence in this case lacks the necessary quantum of proof to establish that the inmates, as a class, have suffered any actual injury supporting the award of $500,000 in consequential damages. Further, I concur in Judge Jameson's analysis that, absent a demonstration of actual harm, an award of consequential damages to the entire class is inappropriate. I therefore agree in the award of nominal damages.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

I concur in parts I–IV(A) and the result in part V of Judge Jameson's opinion for the court, but must respectfully dissent from parts IV(B) and (C) because I believe that the trial court erred in entering judgment notwithstanding the verdict on the question of damages. The standard for determining whether a judgment n.o.v. should be granted is "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir.1985). Any conflicts in the evidence and all permissible inferences from the evidence must be resolved in favor of the party resisting the motion. *Id.* Therefore, entry of judgment n.o.v. is appropriate in this case only if there is insufficient evidence upon which a reasonable person could properly base an award of damages. *See id.*

The trial judge stated that several factors motivated him to enter judgment n.o.v.: the concerns expressed in Judge MacKinnon's separate statement in *Doe v. District of Columbia*, 697 F.2d 1115 (D.C. Cir.1983) (separate statement reported at 701 F.2d 948), the pendency of additional class actions by other jail inmates seeking similar relief, the fact that the judgment would affect the public interest as well as the interest of the class members, and the fact that there was insufficient evidence of actual harm to support the jury's verdict. Of these factors, all but the latter are general considerations that the jury was capable of taking (and may well have taken) into account when determining the amount of its award. For example, the jury was undoubtedly made aware that a few members of the plaintiff class may not have "deserved" money damages and that an award against the defendants would most likely be paid out of public funds. In my view, the trial court erred in substituting its own judgment on these matters for that of the jury.

That leaves as the only theoretically appropriate basis for granting judgment n.o.v. the trial judge's conclusion that there was insufficient evidence to support the jury's award of damages. In reaching this conclusion, however, the judge did not com-

ment on why he found the plaintiffs' unre-butted evidence insufficient or what further evidence he would have required. The majority's current attempts to justify the trial court's finding of insufficient evidence, *see ante* at 840, 847, are based on alleged weaknesses in the evidence that properly go only to the amount of damages due for the injury, not to whether an injury occurred in the first place. For instance, Dr. Schuster's testimony that only a small percentage of inmates would suffer *severe* stress due to the unconstitutional conditions in the jail does not preclude an award of damages for the less severe psychological injuries experienced (as Dr. Schuster testified and as the jury could infer from the evidence) by virtually every member of the plaintiff class. In addition, the fact that eighty percent of the class was incarcerated for two days or less was taken into account by the jury in fashioning its verdict on a per diem basis. A person incarcerated for two days would therefore receive only $26 in damages, hardly an excessive amount for enduring the conditions concededly present in the jail during the first subclass period. Finally, the majority's attempt to discount one of the plaintiffs' professed fear of homosexual attack as "common among all young inmates," *ante* at 840, 847, does not support a conclusion that the fear was not justified, real, or caused by the defendants' lack of supervision. Rather, it lends support to the plaintiffs' assertion that these fears of bodily injury and the other psychological harm resulting from the unconstitutional conditions in the jail were common among class members.

Although I therefore am not persuaded that there was insufficient evidence to support the jury's award of damages in this case, my primary concern is with the trial court's apparently conflicting rulings. If the trial judge was concerned that a certain group of inmates (*i.e.,* those who preyed on other inmates) should not receive any damages or that the witnesses who testified did not adequately represent the experiences of the entire class, then the judge should have either refused to grant class certification for the damages portion of this litigation or should have established subclasses of inmates based on prison conduct and/or experience.[1] Once the court ruled that questions of law or fact were common to the class and that the damage claims of the named plaintiffs were typical of the damages suffered by the class, it should have been left to the jury to decide how to factor into its award the fact that some members of the plaintiff class may have been undeserving of money damages, and the witnesses' observations should not have been discounted as unrepresentative of the entire class. From a reliance standpoint, I find troubling the fact that the trial court first granted class certification; then consolidated into the class action at least ten individual prisoner suits against the defendants, leading the plaintiffs to believe both that their evidence would be deemed typical of other class members and that it would not be necessary (or even acceptable) for each individual plaintiff to present his own evidence; and finally ruled that the plaintiffs' evidence was insufficient to support an award of damages to the entire class. Once the judge decided that the evidence presented was not representative of the class or that some of the class members did not deserve a monetary award, the class should have been decertified (with notice to all class members) and the jury's verdict either upheld as to the named plaintiffs or a new trial (or trials) held on damages for individual plaintiffs.

If the judge's concern was not so much that the evidence was insufficient but rather that the jury's verdict was excessive, he should have ordered a remittitur and given the plaintiffs the option of accepting the lower award or retrying the case. In short, I would remand this case for a renewed and more equitable determination of the plaintiffs' claims for damages, whether

---

1. In this regard, it should be noted that the plaintiffs expressly sought a ruling in January 1982 "whether the class should be subdivided into subclasses and a determination of their proper scope, if appropriate."

by holding a new trial for the plaintiffs to provide sufficient evidence of actual harm to the entire class, decertifying the class as to damages and then holding a new trial on damages for individual plaintiffs, decertifying the class and reinstating the jury verdict as to the named plaintiffs, or ordering a remittitur.

Turning to the majority's contention that consequential damages are inappropriate in the absence of proof of actual harm, it should be noted that the plaintiffs have never asserted otherwise. Rather, the inmates' complaint requested only declaratory and injunctive relief plus "money damages for any *actual injuries* sustained as a result of the complained of conditions and practices at the Madison County Jail" (emphasis added). The question of whether actual harm must be shown was never an issue in this case until the Indiana Civil Liberties Union filed an amicus brief on appeal. This case is thus distinguishable from *Doe v. District of Columbia*, 697 F.2d 1115 (D.C.Cir.1983), in which the jury was instructed that it could award damages for the intrinsic value of the plaintiffs' constitutional rights. *Id.* at 1122. It seems inappropriate to suggest that *Doe* established a new legal principle that justifies the trial court's finding of insufficient evidence in this case when *Doe* only enunciated a rule that the plaintiffs have consistently acknowledged—that they could not recover damages for violation of their constitutional rights in the absence of proof of actual harm. *See Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978); *Doe*, 697 F.2d at 1122–25.

I must further dissent from the trial court's and the majority's reliance on Judge MacKinnon's separate statement in *Doe* to support setting aside the jury's award of damages to the plaintiffs. In my view, *Doe* has little relevance to the question of whether the plaintiffs introduced sufficient evidence to support an award of damages in this case. In *Doe*, the plaintiff class consisted of convicted inmates in a maximum security facility. 697 F.2d at 1117. The named plaintiffs had been convicted of first degree murder, second degree murder, kidnapping, armed robbery, manslaughter, bank robbery, attempted rape, grand larceny, and assault with a dangerous weapon. *Doe*, 701 F.2d at 949 (separate statement of MacKinnon, J.). Each of the six counts of the prisoners' complaint in *Doe* was based on actual and threatened inmate violence and a pervasive risk of harm in the institution. *Id.* at 948. Judge MacKinnon's belief that the inmates had not presented sufficient evidence to support a finding that these conditions violated their constitutional rights was based on his view that (1) some level of violence is to be expected in a maximum security prison, and (2) there was insufficient evidence that the violence at the institution was excessive. *Id.* at 953. Judge MacKinnon's statement therefore addressed the question of whether there were unconstitutional conditions in the prison in the first instance, whereas in this case the defendants admitted that conditions in the Madison County Jail did not meet minimum constitutional standards. Furthermore, in contrast to the maximum security prison at issue in *Doe*, Madison County Jail is a local jail housing pretrial detainees; misdemeanants, others serving short-term sentences, and some convicted persons awaiting transportation to the state prison system. Of the initial named plaintiffs in this action, for example, three were pretrial detainees, one was serving a one-year sentence for driving without a license, one was serving a short sentence for an unnamed offense, and two had been convicted of robbery and were awaiting their transfer to prison. Approximately 90% of the plaintiff class of inmates consists of pretrial detainees. Because the situation in *Doe* bears little factual resemblance to the case before us, Judge MacKinnon's view that inmate violence is to be expected in a maximum security prison that houses violent convictees has little if any relevance to the instant case.

Judge MacKinnon's separate statement expressed his further belief, which the trial judge below found particularly persuasive, that it would be "incongruous to pay mon-

ey damages to prisoners who are *causing* the violence and unhygienic conditions, who adhere to a code of silence, and who refuse to report violations or to cooperate in ameliorating the conditions about which they complain." *Id.* at 949 (citation omitted). In reaching this conclusion, however, Judge MacKinnon expressly distinguished the situation in *Doe,* where the only actual harm alleged was the lack of supervision and consequent pervasive risk of harm due to inmate violence, from cases like the present one, where a substantial number and variety of unconstitutional prison conditions are alleged. *Id.* at 950. Judge MacKinnon himself recognized, therefore, that his reasons for criticizing an award of damages to a class of prisoners would not apply to a Madison County Jail situation. There is no indication in this case, for example, that any members of the plaintiff class were responsible for the overcrowding, the lack of ventilation, the inadequate lighting, the inoperative shower, toilet, and wash basin facilities, the boarded-up windows, or the inadequate health care, visitation policies, library facilities, and recreational programs. The fact that a few members of the plaintiff class may have contributed to a few of the unconstitutional conditions found in the prison does not justify denying relief to the entire class. In sum, I believe that reliance on Judge MacKinnon's separate statement in *Doe* is inappropriate in this case and cannot support a finding that there was insufficient evidence to sustain the jury's award of damages to the plaintiff class.