589 F.2d 300
 Henry PRESTON et al., Plaintiffs-Appellees,
and
Local 494, American Federation of State, County, and
Municipal Employees, AFL-CIO, Proposed Intervening
Plaintiff-Appellant,
v.
James THOMPSON, Governor of the State of Illinois, etc., et
al., Defendants-Appellants.
 Nos. 78-2401, 78-2516.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1978.
Decided Dec. 15, 1978.
 
 Joseph M. Cotugno, Dept. of Corrections, Chicago, Ill., for defendants-appellants.
 Gilbert Feldman, G. Flint Taylor, Jr., Chicago, Ill., for plaintiffs-appellees.
 Before SWYGERT, LAY[1] and PELL, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 The principal question before us is whether the district judge abused his discretion when he issued a preliminary injunction which required officials in charge of the Pontiac Correctional Center to provide two showers a week to all inmates and a daily hour of yard recreation to prisoners incarcerated in the west cellblock. We hold that the district judge did not abuse his discretion. We also hold that the district judge did not err when, in conjunction with the preliminary injunction, he found as a matter of law that tensions at Pontiac subsided soon after the July 22 riot and that an "emergency" situation did not exist at the prison as of November 3, 1978. Finally, we conclude that the district court's denial of the motion to intervene filed by the prison guards' union did not constitute an abuse of discretion.
 
 
 2
 On July 22, 1978 a riot broke out among the prisoners incarcerated in the north and south cellblocks of the Pontiac Correctional Center. Three guards were killed, three other guards injured, and the buildings and facilities of the prison suffered massive damage. Pontiac prison officials, aided by outside tactical reinforcement, quickly restored order and immediately imposed a "deadlock" on the cellblocks of Pontiac prison.
 
 
 3
 Under the terms of a deadlock, prisoners are locked in their cells twenty-four hours a day. Meals are brought to the prisoners in their cells, and work assignments and recreation periods are cancelled. The deadlock at Pontiac has been marked by its length and severity. Normal prisoner grievance procedures were abolished from the day of the riot, July 22, to October 16, 1978. Prisoners received no showers until October. Family visits were banned from July 22 to October 14, and prisoners were not permitted to make any phone calls, even though this did not necessitate a prisoner's leaving his cell, until September 30. The correction officials did not begin the "shakedown" of the prison a search of each prisoner for weapons and contraband which is a preliminary step to a lifting of a deadlock until October 2. Even today, "normal" procedures have not been restored. Meal, work, and recreation time is either severely curtailed or non-existent, and the prisoners spend all but a few hours a week locked in their six by ten feet two-man cells.
 
 
 4
 On August 31, 1978 plaintiffs, prisoners incarcerated at Pontiac prison, brought an action for injunctive relief pursuant to 42 U.S.C. § 1983. They contended that the deadlock had continued longer than necessary for emergency, security purposes and was being maintained in violation of their constitutional rights. On September 7 plaintiffs moved for preliminary injunctive relief. The hearing on this motion commenced September 25; on September 29 the district judge continued the hearings to await the results of the shakedown which was to begin October 2 and was completed October 13. The hearing resumed October 16 and continued until October 25. On November 3 the district court issued a preliminary injunction against defendants.
 
 
 5
 The district court order of November 3 required Pontiac correction officials to restore family visitation and telephone privileges to their pre-riot status. The injunction also required defendants to provide two hours of yard recreation a week to prisoners in the north and south cellblocks. These requirements have been substantially complied with and have not been appealed. The injunction also directed defendants to produce a comprehensive plan for the reinstitution of pre-riot meal, work, and exercise routines. The defendants have presented the district court with a timetable for the restoration of these activities and the district judge has maintained jurisdiction over this element of his order to ensure that the execution of the timetable is constitutionally adequate. This provision of the district court's November 3 order was not appealed.
 
 
 6
 Defendants appeal from the district court's finding, made in conjunction with the November 3 order, that an emergency no longer exists at Pontiac prison. They also appeal the district court's requirements that all prisoners be permitted two showers a week and that prisoners in the west cellblock be given an hour of yard recreation daily. These provisions of the November 3 order have been stayed pending this appeal.
 
 
 7
 The district court's conclusions that tension at Pontiac decreased soon after the riot and that, as of November 3, no emergency existed justifying the continuation of the lock-up, can be overturned only if "clearly erroneous." Fed.R.Civ.P. 52(a). We hold that these findings were not clearly erroneous. The district judge heard numerous witnesses prison officials, guards, observers, psychologists, prisoners who testified regarding the level of tension and the potential security dangers in the prison. In this testimony, even some of the defendant officials seemed to acknowledge that an emergency no longer existed. Further, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a).
 
 
 8
 The district judge personally visited Pontiac prison, and later appointed a law clerk to observe the shakedown procedure. The trial court also took evidence about the character and frequency of unusual incidents occurring among the prisoners during the deadlock. The record reflects that these incidents decreased sharply after the first week in August, and that few of the incidents reported had anything to do with the potential security posture of the prison if the lock-up were lifted. The district court correctly observed that the existence of tension in a prison particularly in a prison in which the inmates are locked in double cells twenty-four hours a day does not mean that a security emergency exists. See generally La Batt v. Twomey, 513 F.2d 641, 648 (7th Cir. 1975). The district court's findings that tensions decreased soon after the riot and that an emergency did not exist as of November 3 are upheld.
 
 
 9
 Defendants also appeal the shower and west cellblock recreation provisions of the November 3 order. A trial court, however, has considerable latitude in shaping injunctive relief; as we have noted before:
 
 
 10
 Since an application for a preliminary injunction is addressed to the sound discretion of the trial court, appellate review is extremely limited. Hulburt Oil and Grease Co. v. Hulburt Oil and Grease Co., 346 F.2d 260 (7th Cir.), Cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 77 (1965); Scherr v. Volpe, 466 F.2d 1027 (7th Cir. 1972).
 
 
 11
 American Medical Assoc. v. Weinberger, 522 F.2d 921, 924 (7th Cir. 1975). The district court's injunction must be viewed in the context of the court's duty to intervene in prison administration if that administration violates constitutional norms. Courts should be hesitant to interfere with the discretion afforded prison officials, but "in proper cases a federal court can, and must, compel state officials or employees to perform their official duties in compliance with the Constitution of the United States." Newman v. State of Alabama, 559 F.2d 283, 288 (5th Cir. 1977), Cert. denied, --- U.S. ----, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). See also Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). And once a constitutional violation is demonstrated, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 115, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). See also Newman, supra at 288.
 
 
 12
 The district court, having concluded that violations of due process had occurred in the course of the deadlock,[2] had considerable discretion to devise a remedy. The shower and west cellblock recreation provisions of the limited preliminary relief ordered by the district court on November 3 do not constitute an abuse of this discretion. The fact that these elements of the relief package may go beyond the constitutional minimum does not mean that the court lacks the authority to order them to remedy a constitutional violation. Swann, supra; Newman, supra. Nor do defendants' assertions that these programs will create debilitating and dangerous staffing problems compel us to overturn the district court. The district court heard the evidence about staffing offered by defendants at the preliminary hearing and concluded that this evidence was outweighed by the need to restore some of the normal prison privileges at Pontiac in order to remedy the constitutional violations. The defendants cannot rely on fiscal and administrative difficulties to frustrate a district court's mandate to remedy constitutional violations. See, e. g., Newman, supra At 288. And finally, since this is preliminary relief and still within the jurisdiction and discretion of the district judge, the precise provisions of the order are, if necessary, subject to reconsideration and revision by the district court.[3]
 
 
 13
 We also hold that the district court did not abuse its discretion when it denied the union's motion to intervene. The union did not present its motion until November 28, over three weeks after the preliminary relief was granted. The prison guards were aware of the litigation; in fact, many of them participated as witnesses for the defendants. They also knew that the relief sought by plaintiffs, by increasing prisoner movement, could impinge on the interests they now assert. Yet the union did nothing until three weeks after the State received an adverse decision. The Supreme Court has noted:
 
 
 14
 Timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review.
 
 
 15
 NAACP v. New York, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973). Under these circumstances, we hold that the district court's order denying the union's motion to intervene was proper. See EEOC v. United Air Lines, Inc., 515 F.2d 946 (7th Cir. 1975).[4]
 
 
 16
 In conclusion, we affirm the district court's November 3 order and its denial of the union's motion to intervene. The stay on the enforcement of the contested provisions of the order is vacated, effective immediately. The case in its entirety is remanded to the district court for continued adjudication of plaintiffs' claims.
 
 
 17
 PELL, Circuit Judge, dissenting in part, concurring in part.
 
 
 18
 The present appeal does not involve one of the rather frequently filed prisoner cases where in the normal context of prison life there has been a claimed unconstitutional interference with matters such as access to legal materials, communication rights with the courts, counsel or family, or needed medical care; most of these factual situations probably not being of a nature which the Founding Fathers would have had in mind as constituting cruel and unusual punishment but which in appropriate cases have been the recipient of judicial protection under the aegis of due process.[1]
 
 
 19
 It is true that in the present appeal the claimed deprivations for the most part could be similarly categorized with those mentioned above. The trenchant difference is that the deprivations here involved did not come into being in the normal context of prison life but instead followed a vicious attack by inmates on six prison officers which resulted in the deaths of three of them and the serious injury of three others as well as substantial damage and, indeed, destruction of physical facilities of the prison complex. Following the cessation of the rioting, other officers, not surprisingly, left employment and despite the bringing of officers from other prisons and the employment of new, but inexperienced, personnel it appears clear to me from the record of this case that a complete and immediate return to conditions as they existed prior to July 22, which the prison authorities flatly assert is impossible, can reasonably be expected to produce further real danger to the life and safety not only of the prison employees but to those confined therein because of having been found to be guilty of serious crimes against society. I decline to add a burning match to the fuse and therefore respectfully dissent.
 
 
 20
 With all due respect to the district court judge who heard testimony resulting in more than 2000 pages of transcript and to my fellow members of the panel of this court, who despite the 13 volumes of transcript, are prepared forthwith to affirm the district court's order of November 3 across the board, I can only regard this litigation insofar as it compels compliance with that part of the district court's order which this court previously had stayed as being unwise second-guessing of the efforts of those on the scene. It is they who have the expertise in the matter of prison administration and who appear to me to be attempting in good faith to restore as rapidly as possible normalcy in a frighteningly dangerous situation.
 
 
 21
 Both this court and the district court, in my opinion, have given insufficient heed to the undoubted wisdom and verity of Mr. Justice Powell's words in Procunier v. Martinez, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974):
 
 
 22
 The Herculean obstacles to effective discharge of these duties (of prison administrators) are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities. (Footnote omitted.)
 
 
 23
 The majority opinion of the panel of this court, while paying respect to the frequently stated principle that courts should be hesitant to interfere with the discretion afforded prison officials, disregards what I deem to be an extremely significant aspect of this case as it was presented to us. Despite the statements in the majority opinion that only portions of the November 3 order were being appealed, the notice of appeal was not so limited, and in both briefs and oral argument the state defendants asked that the judgment of the district court granting the preliminary injunction be reversed in its entirety.
 
 
 24
 Notwithstanding their position that the injunction in toto constituted an improper exercise of judicial discretion, when the emergency appeal came to this court, the state authorities limited their request for a stay pending appeal to only two parts of the injunction order, namely, that all prisoners be provided two showers per week and each inmate of the West cellhouse be provided one hour of yard recreation per day. These might seem, on first blush, not to be of great consequence to the institution but of much importance to those confined. The prison authorities do not regard them lightly, however, and have unswervingly and emphatically averred impossibility of performance. This has been stated in the context of an expressed desire to return as soon as possible to conditions as they were before the riot, accompanied by a detailed explanation of the plan for a step-by-step implementation of that return.
 
 
 25
 As an initial matter, noting that customarily when we receive an appeal challenging a preliminary injunction grant, the request is for a stay of the entire decree, I regard the fact that the attack here was as to only two phases of the order to be indicative of good faith and responsible advocacy on the part of the authorities. The defendants state that they did not seek a stay of the other provisions because they were either in compliance or substantial compliance prior to the issuance of the November 3 order.[2]
 
 
 26
 Additionally, the defendants point out that the ordered recreational schedule would spread supervisory personnel to the point at the present time of insufficient supervision to prevent disturbances. The movement of inmates of two cellhouses had contributed substantially to the severity of the July 22 riot. Further, the yard recreation for the West cellhouse occupants as ordered would require cessation of the program underway for the North cellhouse with resultant increase of tensions there.
 
 
 27
 In its conclusions of law the district court stated that the "number of staff personnel that are required to provide showers, which are the ordinary degree of sanitation, is limited in number." The court, however, made no finding that the available staff, considering all other demands on the officers' time, was even sufficient to meet the indefinite "limited" quantity. Likewise there was no finding that two showers, although concededly desirable, were necessary immediately. The plan which had been filed by the prison authorities on November 1 provided for one shower per week for all inmates. While this scarcely qualifies for a country club atmosphere, it, on the other hand, would appear to meet minimal constitutional standards. Sostre v. McGinnis, 442 F.2d 178, 186 (2d Cir. 1971). The district court specifically found that the removal of a deadlock must be gradual; yet the requirement for immediate implementation when there was no showing of practicable possibility assumes aspects of imposing individual judicial concepts for improvement of the prison system. The aftermath of a riot such as that which occurred at Pontiac would not seem to be the appropriate time or context for reforming the system more expeditiously than practicality permits.
 
 
 28
 It is to be regretted that the necessarily slow and deliberate return to normalcy following the traumatic events of July 22 must undoubtedly adversely affect some prisoners who were innocent of any wrongdoing in relation to the rioting activity. It perhaps, however, is the time also to remember that normalcy as to a prison still contemplates confinement for transgression against societal rules of behavior. Whatever other objectives our prison system may hope to accomplish one of them remains that of punishment and as to that the very fact of involuntary confinement precludes a promise of a Rose Garden.
 
 
 29
 I am not dissenting from that part of the majority opinion with regard to the matter of the intervention by the Union representing the Pontiac guards primarily because of the belatedness of the attempted intervention and in view of the fact that guards individually did have input in the lengthy hearings in the district court. Despite my not dissenting at this time I express the hope that if the district court's handling of this case continues on any substantial time basis the court will see to it that the guard position on lack of security is fully developed as a part of the overall picture. While I think that the matter of prison reform properly belongs to the executive and legislative branches,[3] if the judicial branch does become involved, as it has here, then all pertinent matters bearing on the situation should be given appropriate consideration. In the Pontiac picture, I regard the lack of security for the guards as having a crucial bearing on the return to normalcy.
 
 
 30
 On the principal matter here involved, in sum, while we are reviewing an exercise of discretion, it is a discretion which the cases require should be exercised sparingly and cautiously. In the explosive atmosphere fairly reflected by the record as existing at Pontiac, it appears to me that the discretion was abused as to the two items which had previously been stayed by this court. Irrespective of whether an emergency (itself a fluid term) continues to exist at Pontiac, the record clearly demonstrates in my opinion that the situation in the prison is such as to preclude at this time a complete return to conditions as they existed prior to July 22. Finally, I would hope that on remand the district court will give full consideration to the majority's suggestion that "the precise provisions of the order are, if necessary, subject to reconsideration and revision by the district court."
 
 
 
 [1]
 The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [2]
 The district court based its preliminary relief on due process violations. A determination of plaintiffs' Eighth Amendment claims awaits trial on the merits
 
 
 [3]
 Defendants also attack the injunction on the grounds that the district judge failed to find that there had been irreparable harm, that there was likelihood of success on the merits, that the harm to plaintiffs of denying the injunction would be greater than the harm to defendants of granting it, and that the public interest would be served. The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest. See Burns v. Elrod, 509 F.2d 1133 (7th Cir. 1975), Aff'd, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Swann, supra. The record compels the conclusions that plaintiffs are likely to succeed on the merits and that the harm to the prisoners of rejecting this relief would be greater than the harm to defendants of granting it
 
 
 [4]
 The union's motion to strike the preliminary relief for failure to join it as an indispensable party likewise fails. See Kirkland v. New York State Dept. of Correctional Serv., 520 F.2d 420 (2d Cir. 1975), Cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)
 
 
 [1]
 It is to be noted in the present litigation that there has been no determination made that the prisoners' Eighth Amendment rights to be free from cruel and unusual punishment have been violated
 
 
 [2]
 The fact that a party does not seek a stay of all parts of an injunction should not, it would seem, prevent that party from seeking a complete invalidation on appeal. Nevertheless in view of the apparent lack of burden to the authorities, the possible mootness, and the fact that only a preliminary injunction is involved, I am limiting my dissent to the two points which were the subject of a stay in this court
 
 
 [3]
 It is patent that the prison system in Illinois is past due for an extensive overhaul by someone with a substantial increase in the expenditure of necessary public funds