James DAVENPORT, Charles Richmond, Hector Rivera, Carl Lucas, Roger Pennie, Charles Terry, and Mark McBride, Plaintiffs,

v.

Richard W. DeROBERTIS, Michael Lane, and Michael O'Leary, Defendants.

No. 83 C 4392.

United States District Court, N.D. Illinois, E.D.

Jan. 30, 1987.

Joseph N. DiNatale, Edmund P. Wanderling, DiNatale & Montemurro, Oak Park, Ill., Daniel M. Harris, Mitchell D. Raup, Mayer, Brown & Platt, Chicago, Ill., for plaintiffs.

John Botner, Joseph F. Spitzzeri, Illinois Atty. Gen.'s Office, General Law Div., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND JUDGMENT ORDER

WILLIAM T. HART, District Judge.

This is a class action for deprivation of plaintiffs' constitutional rights brought pursuant to 42 U.S.C. § 1983. Jurisdiction of the court is properly invoked pursuant to 28 U.S.C. § 1343 and is not disputed. Plaintiffs seek damages individually and injunctive relief on behalf of a class of current and potential long-term segregation inmates at the Stateville Correctional Center ("Stateville") operated by the defendant officials of the Illinois Department of Corrections where plaintiffs were or are now confined. Plaintiffs seek to redress alleged individual and class violations of their eighth amendment rights because they contend that they were incarcerated under conditions that subjected them to pain, physical deterioration and emotional distress caused by a lack of adequate showers and physical exercise.

On March 31, 1986, for the purpose of seeking injunctive relief, plaintiffs Rivera and Lucas were certified as representatives of the following class: all present and future Stateville inmates confined to Stateville segregation for 90 or more consecutive days.

The defendants in this action are Richard W. DeRobertis, former Warden of Stateville, Michael P. Lane, Director of the Illinois Department of Corrections, and Michael O'Leary, current Warden of State-

ville. Each defendant was sued for damages and injunctive relief in his individual capacity. After trial, plaintiffs moved to amend the complaint to allege that each defendant was also sued in his official capacity. The charges and issues have essentially related to official conduct. *See Walker v. Rowe*, 791 F.2d 507, 507 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986). Inasmuch as no objections have been made to this amendment and because no other or different proofs would have been presented, this motion is granted. The amendment, however, has eleventh amendment implications which must be considered.

Inasmuch as damages were sought, the liability and damage issues were properly tried to a jury. The matter of injunctive relief, if any, was reserved for decision by the court.

The jury was asked to return a special verdict answering seven questions and to determine damages. In response to the liability questions, the jury found that, under the totality of the circumstances in this case: (1) providing only one shower per week constitutes cruel and unusual punishment; (2) providing only one hour of out-of-cell exercise per week constitutes cruel and unusual punishment; (3) each defendant was personally responsible for cruel and unusual punishment; (4) each defendant acted with deliberate indifference or reckless disregard for the health and well-being or constitutional rights of plaintiffs; (5) plaintiffs sustained injury or damages; (6) defendants' acts or conduct was the proximate cause of plaintiffs' injury or damages; (7) there exists a pattern or custom of defendants which has resulted in the denial of rights to be free from cruel and unusual punishment. Each of the named plaintiffs was awarded one dollar compensatory and one dollar punitive damages against each defendant.

Defendants filed timely motions for a directed verdict, for judgment notwithstanding the verdict or, in the alternative, for a new trial. The parties were also directed to separately brief the issue of

relief should the post-trial motions be denied. This was done, and the matter was set for a status hearing on December 22, 1986. At that time the parties were asked by the court whether they wished to offer any additional evidence directed solely to the question of appropriate relief. Each side indicated a desire to submit the case to the court on the record made at the trial of the liability and damage issues and on the briefs submitted without any additional evidence.

The matters to be resolved are (1) the post-trial motions, (2) defendants' claims of qualified immunity, (3) the application of the eleventh amendment, and (4) the nature of any injunctive relief.

## I.

### Post-Trial Motions

#### A. Directed Verdict—Judgment Notwithstanding the Verdict

The legal standard applicable to defendants' motion for a directed verdict or judgment notwithstanding the verdict is clear. "The motion 'should be denied where the evidence, along with the inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions.'" *Freeman v. Franzen*, 695 F.2d 485, 488 (7th Cir.1982), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983) (quoting *Konczak v. Tyrrell*, 603 F.2d 13, 15 (7th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980)). The court must "resolve all conflicting evidence in favor of the jury's verdict," and may not "reweigh the evidence or make [its] own determinations of credibility." *Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986). The motion must be denied where the evidence includes "disparate accounts of the underlying incident[s]," raising questions of credibility that only the jury may resolve. *Freeman*, 695 F.2d at 488; *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d

1225, 1227 (D.C.Cir.1984) ("if there is substantial conflicting evidence, the judgment n.o.v. motion must be denied.").

There is no dispute as to the applicable constitutional standard. As stated in the instructions to the jury: "prison conditions can be cruel and unusual when they deprive inmates of the minimal civilized measure of life's necessities," when they inflict "pain without justification," or when they violate "the evolving standards of decency that mark the progress of a maturing society." The jury was instructed to make its determinations based on the "totality of the circumstances." Defendants did not object to these instructions, and they are supported by precedent. *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir.1986).

The jury had before it the following uncontested facts which were part of the final pretrial order:

1. Stateville is a maximum security prison operated by the Illinois Department of Corrections. The segregation unit at Stateville is a maximum security unit that houses those inmates who have been found guilty of violating prison rules and regulations. At any one time approximately 225 single-celled inmates are confined in segregation. Prior to January 1985, the segregation unit was in F–House. In January, 1985, the segregation unit was moved to I–House, a newly built segregation unit.

2. The cells in F–House are virtually identical to each other. The dimensions of the typical F–House cell are somewhat pie-shaped 10'6" × 4'9" × 10'6". Available unblocked floor space consists of two rectangular areas measuring approximately 3' × 6½', and 40" × 30".

3. I–House has 24 wings, each wing containing 12 or 13 cells. The cells in I–House are virtually identical to each other. The dimensions of the typical I–House cells are 7'2" × 13'2". Available unblocked floor space consists of a rectangular area approximately 10'2" by 4'9".

4. There is one shower stall in each wing which measures 4'3½" × 7'. It serves the 12 or 13 cells in its wing.

5. The typical I–House cell has a metal door through which the inmate can peer at certain times through a slot 29" from the floor. The cell walls and floor are made of concrete. The typical cell has a window to the outdoors that measures 48" × 11", which can be opened and closed by the inmate.

6. The segregation unit inmates are provided with a stool fixed to the floor, bed (including mattress, pillow, and blanket), sink, toilet, soap, towel, and shelf. The sink has running water. Inmates are allowed to have personal toiletry items in their cells. The prison provides a laundry service for segregation inmates once a week.

7. The defendants, Michael Lane, Michael O'Leary, and Richard DeRobertis were at all times relevant to the lawsuit acting under color of the laws of Illinois and the rules and regulations of the Illinois Department of Corrections. Michael Lane is the Director of the Illinois Department of Corrections. Richard DeRobertis was Warden at Stateville until November 1983, at which time Michael O'Leary became Warden.

8. Illinois Department of Corrections Administrative Rule 804, and Department of Corrections Rules, Section 504.620 (which superseded AR 804), both provide that segregation unit inmates shall be provided with not less than one shower and one hour of recreation or exercise outside their cells a week. Defendant Michael Lane was personally involved in the adoption of these rules. The warden at Stateville has discretion to provide more than the minimum amounts of showers and exercise.

9. Out-of-cell recreation for segregation inmates consists solely of time spent in one of two outdoor recreation yards. Each yard is blacktopped and enclosed by a chain-link fence. The dimensions of the irregularly shaped F–House yards are approximately 63' × 18' × 40' × 42'. The di-

mensions of the five sides yards at I–House are approximately 55′ × 45′ × 32′ × 41′. Both yards have basketball hoops.

10. The procedure for giving segregation inmates their yard time consists of the following. There are two nearly identical outdoor yards at I–House. At any one time, each yard can accommodate up to 10 inmates. Four exercise periods are scheduled each day between 8:30 a.m. and 2:30 p.m. Four guards are required at any given time to provide yard time to those segregation inmates who wish to use it. Two guards cuff the inmates and escort them to their respective yards. Two guards stand watch over the yards in a nearby tower.

11. While the segregation unit was in F–House, segregation inmates were generally provided one shower a week on a scheduled basis. The F–House shower room is located beneath the main floor in the center of the round house. It measures 20′ × 8′. There is also a drying room measuring 10′ × 10′ and an access area measuring 20′ × 4′.

12. Segregation unit inmates are provided no indoor recreation outside of their cells.

13. Segregation unit inmates are locked in their cells 24 hours a day except when they have yard time, take a shower, go to the hospital, see visitors, visit the law library, attend administrative proceedings, appear before the parole board, visit their counselors, or appear in court by means of a writ of habeas corpus.

14. Segregation inmates in I–House can and do at least some limited forms of exercise in their cells such as push-ups, sit-ups, steps-ups, and running in place, although some inmates do not do such exercise.

15. Segregation inmates can and do use the sinks in their cells to wash themselves, although some inmates do not.

16. Medical technicians visit the segregation inmates in their cells on a regular basis and will respond to those inmates who request medical attention. Physician attendants also see to the inmates' medical needs. There is a medical doctor and psychiatrist available for inmates. A clinic and hospital are also available for segregation inmates.

17. The individual plaintiffs were confined to the Stateville segregation unit during the following periods:[1]

| Richmond | 7/82 to 1/84 |
| Pennie | 4/83 to 1/84 |
| Davenport | 2/83 to 6/84 |
| Rivera | 5/83 to 5/84 |
| Lucas | 6/83 to 1/86 |
| Terry | 8/82 to 12/84 |
| McBride | 7/83 to 12/84 |

The jury had before it the "Standards for Adult Correctional Institutions" (second edition) ("A.C.A.") which state with respect to showers and exercise as follows:

2–4224 Written policy and procedure provide that inmates in segregation have the opportunity to shave and shower at least three times per week. (Essential)

DISCUSSION: Inmates in segregation should have the opportunity to maintain an acceptable level of personal hygiene, including the opportunity to shave and shower at least three times per week, unless these procedures present an undue security hazard. If conditions permit, these inmates should be able to shower daily.

2–4232 Written policy and procedure provide that inmates in segregation receive a minimum of one hour per day, five days per week, of exercise outside their cells, unless security or safety considerations dictate otherwise. (Essential)

DISCUSSION: Opportunities to maintain physical fitness are critical for inmates in disciplinary detention and administrative segregation because of the obvious limitations on their movement. They should be provided the opportunity to exercise in an area designated for this purpose, with opportunities to exercise outdoors, weather permitting, unless security or safety considerations dictate otherwise. A

---

1. Two plaintiffs were in custody at the time of trial.

written record should be kept of each inmate's participation, or lack of it, in the exercise program. Reasons for the imposition of constraints should be documented.

The evidence also included the "Standards for Health Service in Prisons" published in July 1979 by the American Medical Association which states with respect to exercise as follows:

161 Written policy and defined procedures outline a program of exercising and require that each inmate is allowed a daily minimum of one hour of exercise involving *large muscle activity*, away from the cell, on a planned, supervised basis.

Discussion: It is recognized that many facilities do not have a separate facility or room for exercising. The dayroom adjacent to the cell may be used for this purpose. The dayroom meets compliance, *if* planned, programmed activities are directly supervised by staff and/or trained volunteers; otherwise, the designated hour would not be different from any of the other hours of the day. Examples of large muscle activity include walking, jogging in place, basketball, ping pong, and isometrics. Television and table games do not meet compliance.

The evidence disclosed that Stateville segregation inmates have been subjected to isolation, locked in their cells almost 24 hours a day for periods up to two years. At most, they are allowed out of their cells for two or three hours a week. There was evidence that their cells are dirty and roach-infested. Sinks and toilets often backed up, flooding the gallery with filth. Water was frequently cold, and the food was usually cold. James Davenport said the cell house smelled like a garbage dump. Hector Rivera said it smelled like spoiled milk. Exercise periods and showers were often denied for periods of several weeks, and they never were allowed more than once a week.

Plaintiffs testified that they experienced skin disorders, head and back pains, and musculo-skeletal problems that they had not had before segregation, and that improved when they were released from segregation. Stateville medical personnel testified that inmates in segregation were less healthy than inmates in the general population.

Dr. Harold Shuman, Stateville's Medical Director, testified that segregation inmates consume 25% more medical services than inmates in the general population. Stateville's health services reports show that generally 15% to 30% (and in one month 71%) of the inmates examined each month by physician's assistants were segregation inmates, although the segregation unit housed only 10% of the more than 2,000 inmates of Stateville.

Plaintiffs (Pennie, Davenport, Rivera, McBride, and Richmond) experienced sleep disorders, nightmares, violent fantasies, and thoughts of suicide while in segregation, and two of them (Davenport and McBride) sought psychiatric counseling. Plaintiffs witnessed bizarre and self-destructive behavior of other inmates in segregation. Defendant DeRobertis testified that suicide and suicide attempts are more common in segregation than in the general population.

Dr. Ronald Shansky, Medical Director of the Illinois Department of Corrections, testified that permitting segregation inmates only one hour of out-of-cell exercise and one shower per week is "medically unacceptable." He stated that limiting inmates to one shower per week increases the likelihood of skin disease and infection, and makes inmates feel "less than human." Dr. Shansky considers three showers per week "essential" to maintain inmates' mental and physical well-being. Dr. Shansky also testified that limiting inmates to one hour per week of out-of-cell exercise is "medically unacceptable" because it can lead to deterioration of the cardio-vascular system, hardening of the arteries, atrophy of muscles, musculo-skeletal problems, and adverse psychological effects. Dr. Shansky stated that limiting inmates to one shower and one hour of exercise per week

would increase inmates' need for health care. Shansky testified that his conclusion that such a limitation on showers and exercise was "medically unacceptable" at Menard in 1976 is equally applicable at Stateville in 1986.

Professor Leon McConville testified, based on his study of penological matters, that prolonged idleness and isolation can cause mental illness and physical deterioration. He stated that limiting inmates to one hour per week of out-of-cell exercise carries grave risks with no penological justification.

Dr. Terry Brelje said that there is a correlation, noted in the professional literature, between prolonged isolation and various psychopathological symptoms.

It is undisputed that Stateville's segregation unit allows inmates far less out-of-cell exercise than other segregation units in maximum security prisons. Dr. John Harness testified that every segregation unit he has visited provides more outside exercise than Stateville.

Professor McConville testified that the general practice in maximum security prisons in civilized countries is to permit all inmates 5–7 hours of exercise per week, and that he knows of no other prison in a civilized country that limits inmates to one hour of exercise per week. Every federal penitentiary, including the "Level VI" prison at Marion, Illinois, permits segregation inmates more hours of out-of-cell exercise per week. McConville concluded that Stateville's exercise limitation is without penological justification.

█ The evidence supports the jury's finding of cruel and unusual punishment. " 'Lack of exercise may certainly rise to a constitutional violation.' " *Shelby County Jail Inmates v. Westlake,* 798 F.2d 1085, 1089 (7th Cir.1986) (quoting *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir.1985)). The jury's verdict is consistent with cases holding similar limitations on out-of-cell exercise to be cruel and unusual punishment. *Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir.1980) (each inmate that is confined to his cell for more than sixteen hours per

day shall ordinarily be given the opportunity to exercise for at least one hour per day outside the cell); *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates."); *Lightfoot v. Walker,* 486 F.Supp. 504, 511 (S.D.Ill.1980) ("one shower and one hour of exercise per week ... is not a medically acceptable frequency or duration of showers or exercise; it promotes deterioration of inmates physically."); *Hutchings v. Corum,* 501 F.Supp. 1276, 1294 (W.D.Mo.1980) ("in order to avoid inhumane conditions a minimum of one hour of exercise per day for each inmate outside the cell must be provided"); *Bono v. Saxbe,* 462 F.Supp. 146, 149 (E.D. Ill.1978), *aff'd in part and remanded in part on other grounds,* 620 F.2d 609 (7th Cir.1980) (finding "a minimum of four (4) hours weekly" of exercise to be constitutionally inadequate and ordering "that inmates in the Marion Control Unit be provided a minimum total of seven (7) hours per week for physical exercise"); *Frazier v. Ward,* 426 F.Supp. 1354, 1368 (N.D.N.Y. 1977) (finding "that the lack of adequate outside yard exercise in the open air may inflict, depending on the strength of the individual, grave physical and psychological harm upon the inmate"); *Conklin v. Hancock,* 334 F.Supp. 1119, 1122 (D.N.H.1971) (ordering that plaintiff receive a daily shower and exercise period); *Morris v. Travisono,* 310 F.Supp. 857, 869 (D.R.I. 1970) (ordering a minimum of two showers a week and one hour a day of exercise).

In *Lightfoot v. Walker,* 486 F.Supp. 504, 511 (S.D.Ill.1980), the court found that the same exercise and shower limitations challenged here violated the eighth amendment when used at Menard Correctional Center. A central issue in this case was whether Stateville's conditions are sufficiently different from Menard to render the *Lightfoot* panel's conclusions inapplicable at Stateville. The medical panel report relied upon by the *Lightfoot* court was introduced

into evidence. That report concludes that limiting inmates to one hour of out-of-cell exercise and one shower per week is "medically unacceptable." Dr. Shansky, one of the authors of the medical panel report and now Medical Director of the Department of Corrections, testified that in his opinion, based upon his medical expertise and his knowledge about both Menard and Stateville, the exercise and shower limitations also are medically unacceptable at Stateville. The jury was entitled to believe him. The jury's finding of cruel and unusual punishment is supported by the evidence.

Defendants also argue that because plaintiffs did not present medical expert testimony establishing that their specific mental and physical ailments were caused by a lack of exercise and showers, the defendants are entitled to judgment notwithstanding the verdict.

■ Plaintiffs testified that they suffered emotional distress, humiliation, personal indignity, and dejection as a result of the denial of adequate out-of-cell exercise and showers. The jury was entitled to believe them. These effects are compensable actual injury under § 1983. *See Memphis Community School District v. Stachura*, — U.S. —, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) ("compensatory damages may include ... 'personal humiliation, and mental anguish and suffering' "); *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978) ("mental and emotional distress ... itself is compensable under § 1983"); *Crawford v. Garnier*, 719 F.2d 1317, 1324 (7th Cir.1983) ("emotional distress, humiliation, personal indignity and physical injury" are "some of the elements of compensable injury").

■ Isolation in solitary confinement can cause compensable emotional damages even where there is no evidence that it caused mental or physical deterioration. *Chapman v. Pickett*, 801 F.2d 912, 916 (7th Cir.1986) ("Chapman was kept in virtual isolation for nine months with severe restrictions on his mobility and daily routine. We cannot say that Chapman did not suffer actual damage.").

■ The jury was instructed that it could award nominal damages of one dollar if it found that "a plaintiff's right to be free from cruel and unusual punishment was violated," but that "the plaintiff has not sustained actual damages." Instructions, p. 28. Defendants did not object to this instruction, and it accurately states the law. Nominal damages "are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury." *Memphis Community School District v. Stachura*, — U.S. —, 106 S.Ct. 2537, 2544 n. 11, 91 L.Ed.2d 249 (1986).

In *Madison County Jail Inmates v. Thompson*, 773 F.2d 834, 844 (7th Cir. 1985), the Seventh Circuit held that nominal damages are an appropriate remedy in an eighth amendment case where the plaintiffs fail to prove actual injury proximately caused by cruel and unusual punishment. Plaintiffs in that case challenged several conditions of confinement, including the lack of a "recreation or exercise program" at the jail. *Id.* at 836. They submitted expert testimony that the challenged conditions "would cause stress to anyone," *id.* at 840, and that "about ten percent of the population would react with significant emotional or mental difficulty." *Id.* The trial court found that the challenged conditions were cruel and unusual punishment, but that the plaintiffs had not proved that those conditions caused them actual injury. The court therefore awarded nominal damages. The Seventh Circuit affirmed, reasoning as follows:

> We agree with the district court that the evidence was insufficient to establish actual harm for the 3,700 inmates for whom damages were awarded. While the evidence does not support a finding of consequential damages, nominal damages are appropriate.

*Id.* at 844.

■ There was ample evidence that the denial of adequate out-of-cell exercise and showers was medically unacceptable and created a substantial threat of mental and

physical injury to inmates. The jury was justified in finding that plaintiffs were subjected to cruel and unusual punishment. Because the jury declined to award substantial compensatory damages, the adequacy of plaintiffs' evidence of damages is not at issue. Whether or not plaintiffs proved actual damages, nominal damages were appropriate. The jury's verdict cannot be set aside for lack of adequate evidentiary support.

### B. Defendants' Motion for a New Trial

Defendants contend that the court should have stricken all of plaintiffs' testimony about the physical and mental effects of solitary confinement upon them, arguing that there is no evidence that the challenged conditions of confinement caused the effects plaintiffs reported.

■ Defendants acknowledge that the expert testimony, construed in light most favorable to plaintiffs, establishes that the challenged conditions "might, could, or are likely to" cause the effects plaintiffs complain of. Defendants' Memorandum of Law at 14, 17–18. From this testimony, along with plaintiffs' testimony that their ailments first occurred in the segregation unit and improved when plaintiffs were released from segregation, the jury could infer that plaintiffs' ailments were caused by conditions in segregation. The evidence was properly considered.

■ Defendants argue that the court should not have permitted Dr. Shansky to express opinions about conditions at Stateville, because Dr. Shansky was not listed on the pretrial order as an expert witness. Dr. Shansky was listed as a witness in the pretrial order. He was not originally listed as an expert, just as Dr. Shuman, who gave expert testimony for defendants, was not listed as an expert. Dr. Shansky's title and his role in the Menard Panel Report, however, made it clear that Dr. Shansky would be asked medical questions which invariably involve opinions. Plaintiffs moved to amend the pretrial order to list Dr. Shansky as an expert witness on September 10,

1986. The court granted that motion at a pretrial conference.

■ Defendants claim that they were surprised by Dr. Shansky's testimony about Stateville. They had no reason to be surprised. The issue of Dr. Shansky's testimony was discussed at a pretrial conference. The court ruled that Dr. Shansky would be required to testify as an expert, and specifically noted that Dr. Shansky's expert opinion on the differences, if any between Menard and Stateville would be relevant to this case. Plaintiff's counsel asked Dr. Shansky whether his opinion about shower and exercise restrictions at Menard was equally applicable at Stateville. The defendants could not have been surprised that plaintiffs asked this question.

Defendants knew what Dr. Shansky would say far better than plaintiffs did. Dr. Shansky testified that he had specifically informed defendant O'Leary that the shower policy in Stateville's segregation unit was medically unacceptable, and that Warden O'Leary promised to change that policy. Defendants' counsel were free to discuss this case with Dr. Shansky before trial, although they successfully opposed plaintiffs' attempt to take his deposition.

Acting pursuant to Fed.R.Evid.Rule 403, the court granted plaintiffs' motion *in limine* to exclude evidence of plaintiffs' past crimes not involving dishonesty or false statement. Pursuant to that ruling, plaintiffs Richmond and Pennie admitted their theft convictions but defendants were not permitted to introduce evidence of the specific crimes (which did not involve dishonesty or false statement) for which the other plaintiffs were incarcerated. Defendants argue that this court had no discretion under Rule 403 to exclude evidence of plaintiffs' past crimes, not involving dishonesty and false statement, no matter how prejudicial that testimony might be. The Seventh Circuit has not decided this issue. *See Christmas v. Sanders*, 759 F.2d 1284, 1290–91 (7th Cir.1985). But there is a line of authority which holds that Rule 403 can be invoked in civil cases to exclude evi-

dence of a plaintiff's prior felony conviction. *Wierstak v. Heffernan,* 789 F.2d 968, 972 (1st Cir.1986); *Radtke v. Cessna Aircraft Co.,* 707 F.2d 999, 1000 (8th Cir.1983). *See also* authorities cited in *Christmas,* 759 F.2d at 1291.

Even if defendants were entitled to introduce evidence of plaintiffs' crimes, the exclusion was not prejudicial. The jury was told that all plaintiffs were convicted criminals who had also violated prison rules. There was testimony about how long they had been in prison and in segregation. Plaintiffs Pennie and Richmond testified about their theft convictions. Defendants also introduced evidence that Stateville is a maximum security prison for serious offenses, that 30% of the Stateville inmates were there for murder, and that most segregation inmates had been sent to segregation for assault.

The court also excluded evidence of the specific rule violations for which plaintiffs (other than Roger Pennie) were sent to segregation, for the same reason that it excluded evidence of the crimes for which plaintiffs were sent to prison: such evidence would have been more prejudicial than probative. It might have suggested to the jury that particular plaintiffs were evil men who did not deserve consideration of their claims.

The ruling was made in response to the defendants' objection to Roger Pennie's testimony about the reasons for his confinement in segregation. Pennie testified that he was sent to segregation for attempted escape, and started to testify that he was later acquitted of the escape charge in a criminal trial. Defendants objected to the latter testimony, because it suggested that Pennie was unjustly confined in segregation. The court sustained defendants' objection, and ruled that no further evidence of the reasons (or lack thereof) for plaintiff's confinement in segregation would be admitted.

Defendant O'Leary testified that some inmates were in segregation for murders committed in prison. Superintendent Romero and defendants testified at great length (and without objection) about the violent propensities of the segregation inmates; how they would run wild when let out of their cells, fight with each other and with guards and destroy prison fixtures. Defendants also introduced evidence that 30% of the inmates in Stateville are there for murder, that 70% are there for Class X or Class I felonies, that most of the inmates in segregation are there for assault, and that segregation inmates generally comprise "the worst of the worst."

Plaintiffs, far from trying to exclude this evidence, readily admitted it. Plaintiffs testified about the frequency of their visits to the adjustment committee, and about the bizarre and disruptive behavior of other inmates in segregation. On cross-examination they acknowledged that they had been sent to segregation for violation of prison rules. Professor McConville testified about the violent behavior of the segregation inmates (based on his interview with Roger Pennie) and opined that violent behavior often is caused by excessive isolation and idleness.

Defendants were not precluded from introducing evidence to support their claim that segregation inmates are violent, and that security concerns therefore justify shower and exercise restrictions. Furthermore, the court specifically ruled that defendants were entitled to show that particular plaintiffs had been "fractious" while in segregation, and therefore could not safely be allowed out of their cells for showers or exercise. Defendants were not prejudiced by the exclusion of the specifics of plaintiffs' rule violations.

Defendants complain that the court did not specifically instruct the jury that the A.C.A. and American Medical Association standards do not establish constitutional minima. Plaintiffs never suggested to the jury that the A.C.A. and American Medical Association standards were dispositive. From the start the jury was told to consider the totality of the circumstances. This court's instructions made clear that expert opinions were not dispositive and that the

case was to be decided on the basis of the totality of the circumstances.

■ The court had no duty to go beyond the instructions it gave and explicitly reject a notion—that the American Medical Association and A.C.A. standards were dispositive—that had never been suggested in the course of the litigation. *Brandes v. Burbank*, 613 F.2d 658, 669 (7th Cir.1980) ("The primary purpose of instructions is to tell the jury what the applicable law is rather than what it is not. ... If the essential elements are imparted to the jury, the judge has performed the necessary task.").

■ It would have been a mistake to give the instructions proposed by defendants, since the instructions might have confused the jury or appeared to be a comment on the evidence intended to favor the defense. *Lenard v. Argento*, 699 F.2d 874, 890 (7th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983) ("Repetitious instructions which place undue emphasis on matters favorable to either side constitute reversible error.").

■ Defendants argue that the jury's verdict must have been an improper compromise because the jury found a constitutional violation and injury, but awarded each individual plaintiff only $3.00 in compensatory and $3.00 in punitive damages. There is nothing improper about a finding of constitutional violation and an award of nominal damages to particular individual plaintiffs. *Carey v. Piphus*, 435 U.S. 247, 264–67, 98 S.Ct. 1042, 1052–54, 55 L.Ed.2d 252 (1978); *Ustrak v. Fairman*, 781 F.2d 573, 578 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 95, 93 L.Ed.2d 47 (1986); *Madison County Jail Inmates v. Thompson*, 773 F.2d 834 (7th Cir.1985). Nominal damages are particularly appropriate where, as here, the evidence of serious injury to the plaintiff class (e.g., suicide attempts, disproportionate use of medical services) was stronger than the evidence of serious injury to the individual plaintiffs. *Madison County Jail Inmates, supra* (evidence that "about ten percent of the population would react with significant

emotional or mental difficulty" and "severe stress" justified award of nominal damages). Finally, plaintiffs' attorneys stated to the jury in final argument that they were more interested in the jury finding "cruel and unusual punishment" than in money damages—clearly inviting an award of nominal damages, but supportive of corrective relief.

## II.

### Qualified Immunity from Damages and the Application of the Eleventh Amendment

Defendants contend that they are individually immune from monetary damages through the application of qualified immunity. They argue that where application of constitutional rules requires balancing, in this case a review of the totality of conditions of confinement at a particular facility, the doctrine of qualified immunity is applicable since the law cannot be said to be clearly established.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Two years later, in *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the Court reaffirmed the holding in *Harlow* and stated:

> "[A]n official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was 'clearly established' at the time of the violation."

*Davis*, 468 U.S. at 194, 104 S.Ct. at 3019–20 (emphasis omitted).

The Seventh Circuit has held that

> [t]he words "clearly established ... constitutional rights" may not be used to read the defense of immunity out of federal tort law by the facile expedient of

stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, ... can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right. The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.

*Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986).

The Seventh Circuit has found that "there is one type of constitutional rule, namely that involving the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the 'law' can rarely be considered 'clearly established.'" *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). The Court noted with approval *Murray v. Gardner,* 741 F.2d 434, 440 n. 2 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985):

> Government officials must be granted the ability to pass unmolested through bogs of murky legal precedent. They must not become prey to every hypothesis of what the law might have come to forbid had it eventually developed along certain lines. When the law is clear, and an official's duties delineated, then he will not be able to rely on the immunity defense. But we must not and do not demand that every government official become skilled in guessing the future path of the law.

The Court in *Benson* concluded that "whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability ... qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required." 786 F.2d at 276.

In denying defendants' motion to dismiss, this court reserved ruling on the constitutionality of the exercise and showers permitted plaintiffs. This court noted that "[a]s stated by the Seventh Circuit in *Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984), '[v]arious prison conditions do not exist in isolation. Rather, challenged conditions must be viewed in the light of other prison conditions that may aggravate or mitigate the effect of the challenged conditions.'" Memorandum Opinion and Order, September 13, 1984.

Constitutional entitlement by segregation unit inmates to more than one shower and one exercise period per week at Stateville was not clearly established law. Illinois law provides that "[a]ll institutions and facilities of the Department shall provide every committed person with access to ... bathing facilities at least once each week...." Ill.Rev.Stat. ch. 38, ¶ 1003–7–2(a), eff. August 31, 1979. State statutes are presumed to be constitutional. *North Shore Post No. 21 of the American Legion v. Korzen,* 38 Ill.2d 231, 230 N.E.2d 833 (1967).

In *Pinkston v. Bensinger,* 359 F.Supp. 95 (N.D.Ill.1973), the court held that one hour of exercise and one shower per week did not constitute cruel and unusual punishment at Joliet. In *Preston v. Thompson,* 589 F.2d 300 (7th Cir.1978), the Seventh Circuit held that the district court did not abuse its discretion when it issued a preliminary injunction which required prison officials at Pontiac to provide, *inter alia,* two showers a week and daily recreation to all inmates. The court stated that this might go beyond the constitutional minimum. The dissent stated a plan submitted by prison officials to provide one shower a week for all inmates "would appear to meet minimal constitutional standards." *Id.* at 306 (citing *Sostre v. McGinnis,* 442 F.2d 178, 186 (2d Cir.1971)). In *Sostre,* hygienic conditions were found adequate where plaintiff was allowed to shave

and shower with hot water once each week and his cell had a sink with cold running water and he was provided with soap and a towel. 442 F.2d at 186.

In *Lightfoot v. Walker,* 486 F.Supp. 504 (S.D.Ill.1980), the court found gross deficiencies in the health care system and environmental deficiencies at the Menard Correctional Center. One hour of exercise and one shower per week for segregation inmates at Menard was not medically acceptable. In *Dorrough v. Hogan,* 563 F.2d 1259 (5th Cir.1977), the court affirmed the district court's finding that segregation inmates were not subjected to cruel and unusual punishment in being limited to two one-hour exercise periods a week. The district court had stated that "a court order requiring daily exercise is appropriate *when overall conditions are found to be sub-standard....*" *Id.* at 1263 (emphasis added). In *Walker v. Mintzes,* 771 F.2d 920, 927 (6th Cir.1985), the court found that differing circumstances from prison to prison explain minor differences in constitutionally required yard time.

■ Consequently, the minimum amount of showers and exercise constitutionally required depends on many facts including the adequacy of the health care delivery system, and the finding in *Lightfoot,* where health care was grossly deficient, did not clearly establish a constitutional standard for Stateville where health care delivery is not contested. Seventh Circuit cases support the position that *Lightfoot* does not establish a constitutional standard in the instant action. The Seventh Circuit has stated that "[i]n this circuit, we determine whether there have been 'serious deprivations of basic human needs,' ... by examining the 'totality of the conditions of confinement.'" *French v. Owens,* 777 F.2d 1250, 1252 (7th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986); *Smith v. Fairman,* 690 F.2d 122, 125 (7th Cir.1982), *cert. denied,* 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir.1981).

In *Walker v. Mintzes,* 771 F.2d 920 (6th Cir.1985), the Sixth Circuit affirmed the district court's order that prisoners in segregation be afforded one shower per week as a constitutional minimum. The district court in *Walker* ordered that inmates in administrative segregation be given 30 minutes of yard time each week. The matter of yard time requirements was remanded for further consideration and clarification.

The Seventh Circuit recently found that segregation inmates who received exercise twice a week and spent one hour each week in the commissary were not subjected to "wanton and unnecessary infliction of pain" because they had to exercise in cramped quarters, and that the exercise period allowed was within the constitutional minimum. *French v. Owens,* 777 F.2d 1250, 1255–56 (7th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986).

■ In a matter as fact-bound as this, it cannot be said that the defendants must have known that their conduct was in violation of clear constitutional precedent in this circuit. Accordingly, to the extent that defendants are sued in their individual capacity, they are entitled to qualified immunity from compensatory or punitive damages. The jury's damage verdicts must be set aside.

■ Insofar as defendants are sued in their official capacity, the action is one against the state, *Walker v. Rowe,* 791 F.2d 507, 508 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986), and the eleventh amendment prohibits the imposition of damages, but prospective injunctive relief may be considered to restrain future constitutional violations. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). That is the relief being sought.

### III.

### Equitable Relief

■ The court may rely on the jury's findings of cruel and unusual punishment in deciding the merits of the claim for

equitable relief. The legal liability fact issues decided by the jury are the same as the equitable liability fact issues. This court should accept the jury's findings as predicate for equitable relief after denying post-trial motions. *See Shelby County Jail Inmates v. Westlake,* 798 F.2d 1085, 1092 (7th Cir.1986).

Defendants acknowledge that some change in their present exercise and shower policy "would be supported by the record and meet the constitutional minimum." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Permanent Injunction, at 6.

■ Plaintiffs' request for three showers per week and five hours of out-of-cell exercise per week has ample support in the record. Dr. Ronald Shansky, Medical Director of the Department of Corrections, testified that to prevent physical and psychological deterioration, Stateville segregation inmates should be allowed at least three showers per week and five hours of out-of-cell exercise per week. The American Correctional Association standards also require three showers per week and five hours of out-of-cell exercise per week in the absence of a security emergency. Professor McConville testified that Stateville segregation inmates should be given an hour of out-of-cell exercise every day. The standards of the American Medical Association indicate "a daily minimum of one hour of exercise involving large muscle activity, away from the cell." Defendants are providing Menard segregation inmates with six hours of out-of-cell outdoor exercise per week and three showers per week.

Superintendent Romero testified that exercise yard security measures are "adequate" and that the segregation unit's exercise yards can hold 20 inmates at a time. There are about 200 inmates in the segregation unit. Also, shower facilities are readily accessible to segregation inmates' cells.

The proposed order would require five hours of out-of-cell exercise per week; other courts have ordered seven hours of out-of-cell exercise per week. *Campbell v.*

*Cauthron,* 623 F.2d 503, 507 (8th Cir.1980) ("each inmate that is confined to his cell for more than sixteen hours per day shall ordinarily be given the opportunity to exercise for at least one hour per day outside the cell"); *Bono v. Saxbe,* 462 F.Supp. 146, 149 (E.D.Ill.1978) (ordering "that inmates in the Marion Control Unit be provided a minimum total of seven (7) hours per week for physical exercise"), *aff'd in part and remanded in part on other grounds,* 620 F.2d 609 (7th Cir.1980).

The injunction would apply only to segregation inmates confined for periods of 90 or more consecutive days. Dr. Shansky testified that inmates confined for more than one week need five hours of out-of-cell exercise per week. Many courts have ordered daily exercise for prisoners confined for periods of four days or less. *Ruiz v. Estelle,* 679 F.2d 1115, 1151 (5th Cir.1982) ("each inmate must be afforded the opportunity for at least one hour of exercise a day if he is in administrative segregation for more than three consecutive days"); *Hutchings v. Corum,* 501 F.Supp. 1276, 1294, 1279 (W.D.Mo.1980) ("in order to avoid inhumane conditions a minimum of one hour of exercise per day for each inmate outside the cell must be provided" although most prisoners were incarcerated for only one to three days).

The proposed order would not apply during temporary emergencies and lockdowns which unfortunately are not unusual at Stateville given the nature and size of the population. There would also be an exception for fractious inmates. These exceptions are reasonable. *Conklin v. Hancock,* 334 F.Supp. 1119, 1120, 1122 (D.N.H.1971) (holding that even though the plaintiff was "a high security risk" who had allegedly killed a guard in an escape attempt, he must be allowed a daily shower and a "daily fresh air exercise period of at least one hour").

Based on the record before the court, the proposed relief is appropriate and should be granted. The elimination of cruel and unusual punishment is not only required by the Constitution, it is good penal practice.

The recoil of cruel and unusual punishment is more crime, violence and injury to individuals and to society.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

(1) Plaintiffs' motion to amend their complaint to conform to the evidence and sue defendants Lane and O'Leary in their official capacity is granted.

(2) Defendants' motions for a directed verdict, judgment notwithstanding the verdict and for a new trial are denied.

(3) Defendants individually are entitled to qualified immunity from damages and, in their official capacity, the eleventh amendment prohibits the imposition of damages. The jury's verdicts of compensatory and punitive damages are set aside.

(4) Within 60 days after this order becomes final either by expiration of the time to appeal or after appeal and review, the following mandatory injunction shall take effect:

> Except in temporary emergencies and institutional lockdowns, defendants Michael Lane and Michael O'Leary, and their successors in the offices of Director of the Illinois Department of Corrections and Warden of Stateville Correctional Center, shall provide every Stateville segregation inmate who has been confined in segregation for 90 or more consecutive days the opportunity to shower at least three times each week and to exercise outside of his cell at least five hours each week; *provided, however,* that if a segregation inmate violates prison rules during his exercise or shower period, he may be denied the exercise or shower rights provided herein for a reasonable period of time pursuant to regulation approved by this court; *provided, further,* that other reasonable exceptions to the shower and exercise rights established herein may be created pursuant to regulations approved by this court; *provided, further,* that instances of denial

of minimum shower and exercise periods must be documented.

(5) The court retains jurisdiction of the subject matter and the parties to enforce or modify this injunction.

(6) Plaintiffs may apply for attorneys' fees and costs within 60 days.[2]

---

**2.** Daniel M. Harris and Mitchell D. Raup of the firm of Mayer, Brown & Platt and Joseph N. DiNatale and Edmund P. Wanderling of the firm of DiNatale & Montemurro were appointed to represent the plaintiff class. Appointed counsel provided excellent professional services on behalf of the plaintiffs.